In the United States District Court

For the District of South Carolina


| | | |
|---|---|---|
| Saied Mousa Ramadan | ) | |
| Plaintiff; | ) | |
| | ) | |
| vs. | ) | Civil Action No. |
| | ) | _____ |
| F.B.O.P.; et. al. | ) | |
| | ) | Complaint for |
| Charles Samuels, | ) | Injunctive and |
| individually and in his official | ) | Declaratory Relief, |
| capacity as Director of the | ) | Monetary Damages, |
| Federal Bureau of Prisons; | ) | And Attorney's Fees |
| | ) | |
| C. Eichenlaub, | ) | DEMAND FOR |
| individually and in his official | ) | JURY TRIAL |
| capacity as Regional Director of | ) | |
| the Mid-Atlantic Region of the | ) | |
| Federal Bureau of Prisons; | ) | |
| | ) | |
| Karen F. Hogsten | ) | |
| individually and in her official | ) | |
| capacity as Warden at the Federal | ) | |
| Correctional Institution McDowell | ) | |

Mr. Ratelidge, )

individually and in his official )

capacity as the Associate Warden )

of Programs at the Federal )

Correctional Institution McDowell )

)

Mr. Baxter, )

individually and in his official )

capacity as the former Associate )

Warden of Programs at the Federal )

Correctional Institution McDowell )

)

Mr. Stiller, )

individually and in his official )

capacity as the Captain at the )

Federal Correctional )

Institution McDowell )

)

Gilbert Nash, )

individually and in his official )

capacity as Chaplain at the Federal )

Correctional Institution McDowell )

)

Mr. Connors, )

individually and in his official )

capacity as Chaplain at the Federal )

Correctional Institution McDowell )

)

Defendants; )

COMPLAINT


Comes Now, the Plaintiff, Saied Mousa Ramadan, in pro se
and for his complaint states as follows:



NATURE OF ACTION


1.)  Saied Mousa Ramadan is a born and sincere adherent of
the religion of Islam who was confined at the Federal
Correctional Institution McDowell in Welch, West Virginia.
Plaintiff is currently incarcerated at the Federal
Correctional Institution Edgefield in Edgefield, South
Carolina.


2.)  The most fundamental and central tenet of the Sunni
Islamic Faith, next to the strictly monotheistic belief in the
"One True God" (Allah), requires followers to pray in
congregation, at fixed hours, five times a daily. For clarity,
if compared to the obligatory Fast of the Blessed Month of
Ramadan; which this 4th Circuit and many of it's sister
Circuits have ruled that failure to accommodate Muslim fasting
requirements infringed on a Muslim inmates First Amendment
rights - the five obligatory prayers, performed in
congregation, at their stated fixed times, carry with them a
far more greater weight and obligation than the Fast of the
Blessed Month of Ramadan.

3.)  F.C.I. McDowell policy -- which designates only the
Chapel and individual cells as permissible spaces for Muslims
to pray and forces all Muslims who need to pray while at work,
school or recreation to forgo the most important practice of
their religion -- contradicts B.O.P. national policy and
further precludes Mr. Ramadan from offering his obligatory
congregational prayers at the stated fixed times and therefore
further forces Mr. Ramadan to repeatedly commit a major sin as
defined by his Islamic Faith. F.C.I. McDowell's policy
violates the Religious Land Use and Institutionalized Persons
Act (RLUIPA) and the Religious Freedom Restoration Act (RFRA)
as it places a substantial burden on Mr. Ramadan's free
exercise of religion and does not further a compelling
governmental interest.


4.)  F.C.I. McDowell policy limits religious activity for
all religious groups to specific designated locations --
individual cells, the outdoor worship area (only for Native
Americans) and the general Chapel. In spite of this policy,
Defendant's permit similarly situated religious groups to
routinely pray in locations outside of the areas designated
for religious activities, while penalizing Muslims for praying
outside of their cells or the Chapel. By treating Mr. Ramadan
differently from similarly situated groups, while acting under
color of federal law, the Defendant's have have denied Mr.
Ramadan his right to freely exercise his religion, a right
guaranteed by the Fifth Amendment of the United States
Constitution. F.C.I. McDowell's policy and the enforcement of
such policy by the Defendant's is in complete contradiction

such policy by the Defendant's is in complete contradiction
with the F.B.O.P.'s Technical Reference Manual (TRM) on
Islamic Religious Beliefs and Practices. The TRM clearly
permits Muslim inmates the ability to offer their five
obligatory prayers at their stated fixed times in congregation
throughout the institution. The TRM's language provides avenue
for the safest implementation of Mr. Ramadan's and Muslim
inmates in general congregational prayers as well as
clarifying and any and all issues related to the Islamic
belief and it's practice. The TRM's language is also purposely
written to coincide with and be in accordance to the
aforementioned constitutional right.


  5.)  Furthermore, F.C.I. McDowell's administrative, executive
and general staff acted out in a retaliatory and further
discriminatory manner by engineering and implementing a ban on
Noble Qurans. This being a back-lash for Mr. Ramadan's use of
the Administrative Remedy Procedure concerning the
aforementioned group prayer as provided under the Prisoners
Litigation Reform Act.


  6.) Mr. Ramadan seeks injunctive and declaratory relief
requesting that Defendant's permit him and Muslim prisoners
incarcerated within the F.B.O.P. in general to be allowed to
pray in groups at work detail sites, school, units, and
recreation as incumbent upon them per their universally
recognized religion -- Islam. Mr. Ramadan also seeks exemplary
and nominal damages for the defendant's wanton, reckless,

malicious and oppressive character of the acts complained of
and for the invasion and/or violation of his constitutionally
protected rights to freely exercise his religion and his right
to equal protection under the law.


JURISDICTION AND VENUE


7.)  This Honorable Court has jurisdiction over this action
under the laws of the United States pursuant to 28 U.S.C. § §
1331, 1343(a)(4) and 1346(a)(2), which confer original
jurisdiction on the United States District Courts. This Court
has jurisdiction over the request for declaratory relief
pursuant to 28 U.S.C. § § 2201 and 2202. This Court has
jurisdiction over the request for monetary damages as well.
See; e.g., Davis v. Passman, 442 U.S. 228 (1979); Bivens v.
Six Unknown Agents of Fed. Bureau of Narcotics, 403 U.S. 388
(1971)


8.)  Venue is proper in this District pursuant to 28 U.S.C. §
1391. Plaintiff Saied M. Ramadan is currently located in this
district. The events giving rise to this action occurred in
the district of W. Virginia and continued on into the district
of South Carolina, both being within the jurisdiction of the
Fourth Circuit.

PARTIES


9.)  Plaintiff Saied Mousa Ramadan is, and at all times pertinent was, an adult male confined within the Federal Bureau of Prisons facilities in F.C.I. McDowell, W. Virginia and F.C.I. Edgefield, South Carolina. Mr. Ramadan is a born and sincere follower of the Sunni Islamic Faith.


10.)  Defendant, Federal Bureau of Prisons is an agency of the United States Department of Justice, an executive department of the United States government. The B.O.P. is empowered by the D.O.J. to act through it's governing body, officials, employees and official bodies and to maintain the federal prison circuit.


11.)  Defendant, Charles Samuels, is the Director of the F.B.O.P.. As the director of the F.B.O.P., defendant manages the day to day operations of the facilities bureau wide, and therefore sets forth and regulates policies. Mr. Samuels is being sued in both his individual and official capacities.


12.)  Defendant, C. Eichenlaub is the Regional Director of the Mid-Atlantic Region of the F.B.O.P.. As the regional Director, Defendant manages the day to day operations of the F.B.O.P.'s Mid-Atlantic Region and executes it's policies. Mr. Eichenlaub is being sued in both his individual and official capacities.

13.)   Defendant, Karen F. Hogsten is the Warden of F.C.I.
McDowell in Welch, W.Virginia. As the Warden, Defendant
manages the day to day operations of F.C.I. McDowell and
executes it's policies. Mrs. Hogsten is sued in both her
individual and official capacities.

14.)   Defendant, Mr. Ratelidge is the former Associate Warden
of Operations at F.C.I. McDowell. As an Associate Warden,
Defendant manages the day to day operations of F.C.I. McDowell
and executes it's policies. He is specifically responsible for
all security related matters. Mr. Ratelidge is being sued in
both his individual and official capacities.

15.)   Defendant, Mr. Baxter is the former Associate Warden of
Programs at F.C.I. McDowell. As an Associate Warden, Defendant
manages the day to day operations of programs at F.C.I.
McDowell. He is specifically responsible for all activities
related to religious services. Mr. Baxter is sued in both his
individual and official capacities.

16.)   Defendant, Mr. Stiller is the former Captain at F.C.I.
McDowell. As the Captain, Defendant oversees all security
issues. He is specifically responsible for identifying any and
all security issues. Mr. Stiller is being sued in both his
individual and official capacities.

17.) Defendant, Gilbert Nash is a Chaplain at F.C.I. McDowell. He is responsible for all religious practices and policies at F.C.I. McDowell. Mr. Nash is being sued in both his individual and official capacities.

18.) Defendant, Mr. Connors is a former Chaplain at F.C.I. McDowell. He is responsible for all religious practices and policies at F.C.I. McDowell. Mr. Connors is being sued in both his individual and official capacities.

`                              STATEMENT OF FACTS


   PLAINTIFF SAIED M. RAMADAN'S NEED TO PRAY FIVE TIMES EACH

   DAY IN CONGREGATION IS A FOUNDING PILLAR OF HIS BELIEF



 19.)  Plaintiff Saied M. Ramadan (Register# 39093-083) is an

adult male currently within the custody of F.C.I. Edgefield in

Edgefield, South Carolina.


 20.)  Mr. Ramadan was born into Islam. He is a practicing

Sunni Muslim and a sincere adherent of Sunni Islam. As part

of his religious practice, Mr. Ramadan is required to pray

five times a day in congregation.


 21.)  Following a central tenet of Islamic tradition, Mr.

Ramadan believes that the Quran is the Uncreated Speech of

Allah, or GOD, which commands followers of Islam to pray five

times a day in congregation during specific periods of time.

Mr. Ramadan adheres to the description of prayer, or salat, in

various ahadith (authenticated traditions or reports by

Prophet Muhammad's (peace be upon him) Companions of his

statements and actions). The salat is the second pillar of

Islam only behind the founding belief the La-illaha-illallah

Muhammadar-Rasul-allah (There is no deity worthy of worship,

in truth, except Allah and that Muhammad is the Messenger of

of Allah). As such the salat in congregation is one of only five founding pillars of Islam. According to the Quran, the purpose of the salat is to purify and cultivate the supplicant by washing away sins and to restrain the supplicant from engaging in immoral or unjust actions. As a practicing Muslim, Mr. Ramadan believes that the salat disciplines the adherent, the Muslim, to remember Allah constantly and consistently throughout the days as the source of all blessings. This then encourages believer to enjoin and perform all that is good and forbid and distance himself from all that is evil.

22.) The Sunnah, a compilation of Islamic traditions and practices taught by Prophet Muhammad (peace be upon him), prescribes the rules for engaging in salat. These rules contain many pillars or parts that must be performed in order for the salt to be deemed valid and therefore have the greatest chance of being accepted by Allah. Some of these pillars of the salat are that a worshipper be in a state of Wudu (ablution), that he stand, bow, prostrate, sit, and perform the five prayers at their specified fixed times in congregation. The schedule for offering the salat changes through out the year, as the fixed times for offering the prayer are connected to the movement of the sun.

23.) The fact that the schedule of daily prayers overlaps with periods when the worshipper may be at work, school, recreation or sleeping underscores the fundamental importance

and the role of the prayer as a reminder that Allah is the Most High, the Most Great, the All-Hearer, the All-Seer and therefore must be worshipped and obeyed as He has commanded.

24.)  Mr. Ramadan can complete one of the five daily sets of prayers within 5-6 minutes.

## FEDERAL BUREAU OF PRISON'S AND F.C.I. MCDOWELL'S POLICIES PREVENT PLAINTIFF, AND MUSLIMS IN GENERAL, FROM PRAYING FIVE TIMES A DAY

25.)  Prior to Mr. Ramadan's admission into F.C.I. McDowell, Mr. Ramadan had incarcerated at (4) four other F.B.O.P. governed institutions -- F.C.I. Yazoo, Mississippi; F.C.I. Beaumont, Texas; F.M.C. Lexington, Kentucky; and F.C.I. Mariana, Florida. All of these prisons allowed Mr. Ramadan and Muslims in general the ability to offer their five congregational prayers at their stated fixed times wherever they may have been within each institution, respectively

26.)  Shortly after Mr. Ramadan's arrival and admittance into F.C.I. McDowell, he was informed that F.C.I. McDowell's general prayer policy limited the locations for religious

activity, including offering of prayers, to only three
locations: the Chapel, individual cells and the outdoor
worship area (strictly for Native Americans). Under this
policy, Mr. Ramadan and Muslims in general could not pray at
work detail sites, school or recreation due to these areas
being outside of the authorized locations for religious
activities.

27.) Staff members at F.C.I. McDowell enforced this general
prayer policy against Mr. Ramadan and all Muslims. Staff
members threatened Mr. Ramadan and all Muslims with the
issuance of incident reports which would thereby subject the
offenders to disciplinary action including confinement in the
Special Housing Unit (SHU) or "hole", loss of good conduct
time, and loss of privileges such as use of phone to contact
family or the ability to access the commissary. All of this
simply because Mr. Ramadan and other Muslims were seeking to
offer their prayers in an isolated and traffic free corner.

28.) Staff members at F.C.I. McDowell followed through on
their threats by issuing an incident report and imposing
sanctions on inmate T. Kinard #06707-015 whom received an
incident report for praying individually at recreation.

29.) Between late November 2011 through early January 2012,
Mr. Ramadan engaged in numerous dialouges at different periods
with all of the defendants that were at the time employed at
F.C.I. McDowell. Mr. Ramadan's objective through these

dialogues was to find a sound resolution that would allow Mr.
Ramadan the opportunities needed to perform his five daily
prayers in congregation at their stated fixed times. To reach
his objective Mr. Ramadan did his utmost to educate F.C.I.
McDowell's executive and administrative staff, including all
the defendant's employed at the institution, as to his
religious beliefs, duties and obligations. Mr. Ramdan's
attempt to find a sound resolution was met with a stiff and
harsh resistance founded upon "No!".


 30.)  On or about January 9, 2012, Mr. Ramadan composed a
very clear and direct letter with the utmost respect and
professionalism as possible. Mr. Ramadan's letter was
presented to Defendant's Hogsten, Baxter, Stiller, Nash and
Connors. Mr. Ramadan's letter outlined a.)the significant
importance of the performance of the five obligatory daily
prayers in congregation, at their stated fixed times, b.) his
attempts at a verbal and informal resolution of the issue at
hand, c.) his constitutionally protected rights to freely
exercise his religion, d.) the purpose and scope of the
F.B.O.P.'s Technical Reference Manual (TRM) on Islamic
Religious Beliefs and Practices, e.) the clash between his
rights, the TRM, and F.C.I. McDowell's policies, and f.) that
the matter of the prayer be taken seriously and responded to
in a professionally and timely manner.


 31.)  Mr. Ramadan's January 9th letter was never answered and
only begot a brief encounter with Defendant's Hogsten and

Stiller. In this encounter Mr. Ramadan was informed that his letter was "offensive" and that he should just "keep on programing and stay out of the way."

32.) On or about February 21, 2012, Mr. Ramadan began the F.B.O.P.'s recognized Administrative Remedy Procedure by filling out, completing and submitting a Request for Administrative Remedy Informal Resolution Form (BP-8). In said BP-8 Mr. Ramadan simply reiterated the same argument that was set-out in the Jan. 9th letter.

33.) On or about February 24, 2012, Mr. Ramadan received a response to the BP-8 signed by Chaplain Gilbert Nash. In his reply Mr. Nash relied on word play in a failed attempt to twist and misconstrue the F.B.O.P.'s TRM on Islamic Religious Beliefs and Practices in order to deny Mr. Ramdan's request set-out therein.

34.) However, Mr. Nash did put forward an alternative suggestion that: "inmates of Islamic Faith should be permitted to return to [their] housing units on the move prior to the approaching prayer time from [their] work-site or education, and then return on the move following.". Mr. Nash's suggestion was never acted upon or implemented by the Defendant's.

35.) On or about March 8, 2012, Mr. Ramadan proceeded to the next step of the F.B.O.P.'s Administrative Remedy Procedure by filing a Request for Administrative Remedy or BP-9. In said

BP-9 Mr. Ramadan reiterated the same argument set-out in the Jan.9th letter and subsequent BP-8 in addition to bringing to light the following three points; 1.) not allowing Muslims to offer their congregational prayers at their stated fixed times wherever they may be is in all actuality, forcing them to commit a major sin as defined by their religion, 2.) that the TRM was being severely misconstrued, and 3.) there is no compelling governmental interest in preventing Muslims from offering their prayers as their religion dictates. Furthermore, to assure that the Defendant's the religious obligation upon Mr. Ramadan and Muslims in general, Mr. Ramadan attached (9) nine pages of textual proofs from the Quran and Sunnah that made clear his religious beliefs and obligations concerning the offering of the five daily prayers, at their stated fixed times, in congregation.

36.)  On or about March 27, 2012, Mr. Ramadan received a response to his BP-9 signed by Karen Hogsten, Warden. In her response, Mrs. Hogsten states that F.C.I. McDowell's policy in question was reviewed by the Mid-Atlantic Regional Office and was found to be in compliance with national policy and therefore the request for Administrative Remedy is denied.

37.)  Between the time Mr. Ramadan received Warden Hogsten's response to his BP-9 and Mr. Ramadan's filing of a BP-10 to the Mid-Atlantic Regional Office, Defendant's pursued even stricter regulations toward Mr. Ramadan and the general Muslim population at F.C.I. McDowell. These restrictions

included preventing Mr. Ramadan and the respective Muslim inmates from performing their obligatory prayers, not only in congregation, but also individually throughout the compound except for the Chapel and each Muslim inmates cell. It was during this time period that Defendant's at F.C.I. McDowell issued inmate T. Kinard Reg# 06707-015 an incident report and sanctions for praying individually at recreation.

38.)  Due to Defendant's stricter policies and F.C.I. McDowell's controlled or open movement policy, which governs the movement of the men confined at F.C.I. McDowell throughout the day (controlled movements occur every hour and last for ten minutes. Men can move from an area of the prison to another, only during these hourly ten minute periods. Once an individual arrives at a location, following a controlled movement period, he must remain there for at least one hour until the next controlled movement.), Mr. Ramadan and his fellow Muslims were forced to choose between practicing the most fundamental, central and compelling exercise of their religion (i.e. the congregational prayers) and being able to enjoy and utilize privileges such as the recreation department or the education department (including the leisure/law libraries) or even staying at their work details and earning their living expenses. The Defendant's revamped staunch position towards Mr. Ramadan and Muslim inmates in general, forced them to make the above mentioned decisions between their religion and privileges provided by the government that no other similarly situated groups were forced to make.

Thus it is impossible for Mr. Ramadan and other Muslim inmates
to both adhere to F.C.I. McDowell policies and exercise their
religious beliefs concerning daily prayers.

39.)  On or about April 18, 2012, Mr. Ramadan proceeded with
the next step in the F.B.O.P.'s Administrative Remedy
Procedure or BP-10. Within the BP-10 Mr. Ramadan outlined how
the Defendant's at F.C.I. McDowell implementation of their
institutional policy was in gross conflict with Mr. Ramadan's
constitutional right to freely exercise his religion. Mr.
Ramadan further mentioned the Defendant's stricter policies
and  the detrimental effects, including equal protection
violations, that those policies directly invaded.

40.) Approximately a month after Mr. Ramadan's filing of the
BP-10 and as a form of retaliation for his filing of the
related BP-9, the Defendant's within the Central and Regional
Offices of the  B.O.P. and at F.C.I. McDowell fabricated and
implemented a ban on Qurans. (This ban is addressed through
the F.B.O.P.'s Administrative Remedy Procedure which will be
discussed individually under an independent heading herein.)

41.) On or about June 28, 2012, Mr. Ramadan received a
response to the BP-10 dated June 13, 2012 and signed by C.
Eachinlaub, Mid-Atlantic Regional Director. In his response
Mr. Eachinlaub attempts to redefine and reinvent the 1400+
year old Islamic faith by implying that two weekly meeting
opportunities in the prison Chapel shall suffice Mr. Ramadan's

religious obligations. With that Mr. Eachinlaub denied Mr.
Ramadan's appeal to the Mid-Atlantic Regional Office or
BP-10.


42.)  On or about July 5, 2012, Mr. Ramadan proceeded with
the next and final step in the F.B.O.P.'s Administrative
Remedy Procedure -- a Central Office Administrative Remedy
Appeal or BP-11. In the BP-11 Mr. Ramadan attempts to expound
on the F.B.O.P. policies that the Defendant's blatantly
twisted and misused in failed attempts to intimidate and
discourage Muslim inmates and Mr. Ramadan in particular from
practicing their religion. Mr. Ramadan literally begs and
pleads with the Central Office of the F.B.O.P. to direct the
Defendant's at F.C.I. McDowell to abide by the F.B.O.P.'s TRM
on Islamic Religious Beliefs and Practices which ascertains,
in regards to Muslim inmates, that;


    1.)  Inmates should have the opportunity to pray
       five times a day.
    2.)  Other than Jumuah, it is recommended that
       prayers be made individually or in very small
       groups (2-3 inmates) throughout the day
    3.)  Prayers can be made at work-detail sites,
       schools or units during break times.


43.)  As of this brief, Mr. Ramadan has not received a
response from the Central Office of the F.B.O.P. to his BP-11
concerning congregational prayers.

F.B.O.P. AND F.C.I. MCDOWELL RETALIATED AGAINST MR. RAMADAN
AND MUSLIMS IN GENERAL FOR UTILIZING THE ADMINISTRATIVE
REMEDY PROCEDURE BY BANNING QURANS FROM THE CHAPEL

44.)  On or about May 9, 2012, month after Mr. Ramadan filed
a BP-10 concerning F.C.I. McDowell's policies restricting
Muslim inmates from offering their five obligatory prayers in
congregation at their stated fixed times and as a form of
retaliation for filing the BP-10, Defendant's at F.C.I.
McDowell fabricated and implemented a ban on Qurans.

45.)  The ban on Qurans was first introduced to Mr. Ramadan
and the Muslim Community at F.C.I. McDowell by Defendants
Chaplain Nash and Chaplain Connors. Mr. Ramadan then
immediately inquired Defendants Nash and Connors as to the
origination of the ban. Defendants Nash and Connors informed
Mr. Ramadan that the ban on Qurans initiated at the Central
office of the F.B.O.P.. After being informed of such, Mr.
Ramadan requested an opportunity to view documentation that
validated Nash and Connors information. At that time
Defendants Nash and Connors instructed Mr. Ramadan to come
back at a later time and that they would share the
documentation with him.

46.)  For the weeks following the introduction of the ban on
Qurans, Mr. Ramadan persistently requested to have an
opportunity to view the documents that initiated the ban.

Mr. Ramadan's request to view the documents was to no avail.
Instead, Defendants Nash and Connors would routinely instruct
Mr. Ramadan to come back at a later time.

47.)  It was then that Mr. Ramadan brought the issue of the
ban to Defendant Cpt. Stiller. Mr. Stiller advised Mr. Ramadan
that he would look into the matter and instructed Mr. Ramadan
to bring the ban to his attention the next day at the noon
meal. When Mr. Ramadan complied with Cpt. Stiller's
directives, Mr. Stiller informed Mr. Ramadan that he had
investigated the matter and further firmly confirmed
Defendants Nash and Connors statements that the ban on Qurans
had indeed been instituted by the Central Office of the
F.B.O.P..

48.)  On or about May 25, 2012, Mr. Ramadan initiated the
F.B.O.P.'s Administrative Remedy Procedure  by filing a
Request for Administrative Remedy Informal Resolution Form or
BP-8. In his BP-8 Mr. Ramadan complained that he and Muslims
in general were being discriminated against by not being
allowed to bring their Qurans into the Chapel. Mr. Ramadan
further requested that this discriminatory practice be ceased
immediately.

49.)  A few hours later, on the same day of May 25, 2012,
Mr. Ramadan received a response to the BP-8 in discussion. The
BP-8 was signed by Defendant Nash. The fact that Mr. Ramadan
received his response within hours on the same day is

unheard of in the F.B.O.P. and therefore raised serious
suspicions. Furthermore, in the response Defendant Nash stated
that Mr. Ramadan's "claim" that Muslim inmates are not
permitted to bring there Qurans into the Chapel is "not
accurate". Defendant Nash further stated that inmates may
bring Qurans into the Chapel and that the Chapel itself has
Qurans available in it's library. In summary, Defendant Nash's
response heavily implied that Mr. Ramadan and the Muslim
community at F.C.I. McDowell hallucinated or simply dreamed up
this "claim" of a ban on their own.

  50.) On or about May 30, 2012, Mr. Ramadan proceeded to file
a second or successive BP-8 concerning the ban on Qurans. In
this BP-8 Mr. Ramadan reiterated that fact that for a period
of time he and the Muslims in general at F.C.I. McDowell were
being prevented from bringing their Qurans into the Chapel. In
said BP-8 Mr. Ramadan further highlighted the fact that
Defendants Nash, Connors and Stiller informed him that the ban
was initiated from the Central Office of the F.B.O.P.. In said
BP-8 Mr. Ramadan also stated that though the ban on Qurans had
been somewhat lifted it remained a violation of his right to
freely exercise his religion and his right to equal protection
under the law. Mr. Ramadan then requested written confirmation
that the ban on Qurans had indeed descended from the Central
Office of the F.B.O.P. so that he may pursue the proper legal
action.

51.)   On or about June 3, 2012, Mr. Ramadan received a response to his second or successive BP-8 concerning the ban on Qurans signed by Defendant Nash. In this response, Defendant Nash indirectly acknowledges the fact that a ban on Qurans was instituted. Defendant Nash states that the "specific instructions" he received were "verbal instructions based on sensitive documents that may not be distributed to inmates". However, Defendant Nash falls short of attaching the "instructions" he received to any individual or entity. Thus not fulfilling Mr. Ramadan's request for written confirmation that the ban on Qurans initiated from the Central Office of the F.B.O.P..

52.)   On or about June 13, 2012, Mr. Ramadan proceeded with the next step of the F.B.O.P.'s Administrative Remedy Procedure by filing a request for Administrative Remedy or BP-9. In this BP-9, Mr. Ramadan requested an investigation into and to be informed of whom gave the so-called "verbal instruction". Mr. Ramadan further registered a complaint against Defendants Nash and Connors and whomsoever directed them with the aforementioned "verbal instruction". Mr. Ramadan further requested an investigation into the actions of everyone involved, included but not limited to Defendants Nash, Connors and Stiller, for the actual implementation of the ban on Qurans.

53.)  On or about July 6, 2012, Mr. Ramadan received a response to his BP-9 concerning the ban on Qurans that was signed by Defendant Karen F. Hogsten. In the first paragraph of her response, Defendant Hogsten acknowledges the gist of Mr. Ramadan's requests that are set-out in his BP-9, those being; to be informed of who gave the instructions regarding the ban on Qurans, and an investigation into the actions of staff members at F.C.I. McDowell. However, from that point forward, Defendant Hogsten neither addresses nor answers Mr. Ramadan's requests therein. Instead, Defendant Hogsten simply attempts to side-step significant issues concerning Mr. Ramadan's right to freely exercise his religion, his right to equal protection under the law and what clearly appears to be staff misconduct. Defendant Hogsten's response or lack thereof shows that she was in compliance with and further condoned the actions of staff members under her direct supervision.

54.)  On or about July 16, 2012, Mr. Ramadan proceeded to the next step in the F.B.O.P.'s Administrative Remedy Procedure by filing a Regional Administrative Remedy Appeal, or BP-10, to Defendant C. Eichenlaub, Mid-Atlantic Regional Director. In this BP-10, Mr. Ramadan reiterates his requests set-out in the respective BP-9, which are; 1.) an investigation into whom gave the "verbal instruction" that initiated the ban on Qurans, and 2.) an investigation into the actions of everyone involved in the actual implementation of the ban on Qurans.

55.)  On or about September 22, 2012, Mr. Ramadan received the response to the respective BP-10 signed by C. Eichenlaub, Mid-Atlantic Regional Director. In his response, Defendant C. Eichenlaub, as did Defendant Hogsten, recognized Mr. Ramadan's request of an over-all investigation into the ban on Qurans by staff at F.C.I. McDowell. And, as Defendant Hogsten failed to address or answer Mr. Ramadan's clear requests in the BP-9 level grievance so did Defendant C. Eichenlaub in his response to the subsequent BP-10. Therefore, Defendant Eichenlaub's response or lack thereof also shows his compliance with and condoning of the actions of staff members under his supervision.

56.)  On or about September 24, 2012, Mr. Ramadan proceeded to the next step in the F.B.O.P.'s Administrative Remedy Procedure by filing a Central Office Administrative Remedy Appeal or BP-11. In this BP-11, Mr. Ramadan states that the response/denials of his respective BP-8, BP-9, and BP-10 did not address nor answer his requests concerning the ban on Qurans. Mr. Ramadan then respectfully requested and informed the Central Office of the F.B.O.P. that he would greatly appreciate an actual answer directed to the actual issues raised due to their significant importance, severity, and sensitivity, those being; outright and blatant discrimination in the form of clear, knowing and intentional violations of Mr. Ramadan's right to freely exercise his religion and his right to equal protection under the law.

57.) As of this brief, Mr. Ramadan has not received a response from the Central Office of the F.B.O.P. to his BP-11 concerning the ban on Qurans.


THE FEDERAL BUREAU OF PRISONS AND DEFENDANT CHARLES SAMUELS
RETALIATE AGAINST ALL MUSLIM INMATES WITHIN THE CUSTODY OF
THE FEDERAL BUREAU OF PRISONS
DUE TO AN ADVERSE COURT RULING IN THE "WALKER" CASE/SUIT


58.) On or about January 9, 2013, Mr .Ramadan completes his transfer and admission into F.C.I. Edgefield. Mr. Ramadan was transferred from F.C.I. McDowell due to an increase in his medical care level.

59.) Upon his arrival at F.C.I. Edgefield, Mr. Ramadan and Muslim inmates in general were allowed to offer their prayers at their stated fixed times in congregation wherever they may have been within the institution, including recreation, schools, work details and general areas in the housing units.


60.) On or about January 11th or 14th, 2013, a ruling was handed down in JOHN LINDH WALKER vs. F.B.O.P.. In the Walker case, the Plaintiff's argument was based on the ground that his religious rights are being violated because U.S.P. Terre Haute, a prison within the jurisdiction of the F.B.O.P.,

deprived him daily group prayer. The 7th Circuit District Court ruled in favor of the Plaintiff therefore maintaining his right to freely exercise his religion and his right to equal protection under the law by acknowledging his religious obligation to offer his five daily prayers in congregation at their stated fixed times. The F.B.O.P. is appealing. [See: John Lindh v. Warden; 2013 U.S. Dist. LEXIS 4932]

61.) Throughout the week of January 28, 2013, F.C.I. Edgefield's administrative, executive and general staff began to inform Mr. Ramadan and all other Muslim inmates confined at F.C.I. Edgefield that they were no longer allowed to offer their prayers in congregation or in any areas outside each inmates individual cell and the Chapel. With this new policy F.C.I. Edgefield began to emulate and implement F.C.I. McDowell's strictest policies; The same polices in question throughout this brief and the same polices that invade Mr. Ramadan's right to freely exercise his religion and his right to equal protection under the law. After further verbal inquiries into the reason for the sudden change in Edgefield's policy, Mr. Ramadan was informed through F.C.I. Edgefield's administrative and executive staff that the change in policy towards Muslims was a directive issued by the Central Office of the F.B.O.P.. Through the same sources Mr. Ramadan was also informed that the changes in policy were tagged "effective immediately" and that the changes in policy were backlash from the adverse ruling against the F.B.O.P. in the "Walker" case/suit.

62.)  On or about February 8, 2013, Mr. Ramadan began the
F.B.O.P.'s recognized Administrative Remedy Procedure by
filling out, completing and submitting a Request For
Administrative Remedy Informal Resolution Form or BP-8. In
said BP-8, Mr. Ramadan disclosed the fact that he and other
Muslim adherents had been able to offer their prayers in
congregation throughout the compound and that as of lately
they have been informed by administrative and executive staff
that they can no longer do so. Mr. Ramadan then requests
written confirmation of the reason for the sudden change.

63.)  On or about February 28, 2013, Mr. Ramadan proceeded to
the next step in the F.B.O.P.'s Administrative Remedy
Procedure by filing a Request For Administrative Remedy or
BP-9. In this BP-9 Mr. Ramadan simply reiterated his complaint
in the respective BP-8, that being that he and other Muslim
adherents had been allowed to offer their prayers in
congregation throughout the compound and that as of lately
they can no longer do so.

64.)  On or about April 5, 2013, Mr. Ramadan received the
response to his BP-9 signed by Kenny Atkinson, Warden. In this
response Mr. Atkinson first acknowledges Mr. Ramadan's
complaints. Mr. Atkinson then fails to directly address Mr.
Ramadan's complaints and instead attempts to redefine Mr.
Ramadan's religious obligations by stating that "the only
obligatory congregate prayer for Muslims is Jumuah Prayer on
Friday, all other daily prayers can be made individually.".

65.)  On or about April 16, 2013, Mr. Ramadan proceeded to the next step of the F.B.O.P.'s Administrative Remedy Procedure, a Regional Administrative Remedy Appeal or BP-10. In this BP-10, Mr. Ramadan simply requests written confirmation that the change in F.C.I. Edgefield's policy -- which directly effects a Muslim inmates ability to offer their obligatory daily prayers in congregation -- initiated from the Central Office of the B.O.P. due to the ruling in the John Walker Lindh suit as was stated by F.C.I. Edgefield administrative and executive staff.

66.)  On or about May 28, 2013, the Warden at F.C.I. Edgefield posted a operations memorandum for "all concerned" with the subject being "inmate workplace prayer". In the memorandum Mr. Atkinson outlines accepted procedures at Edgefield for those inmates who choose to pray at work. Mr. Atkinson states that congregational prayers are not allowed at the work-site and that individual prayer will be permitted at the work-site provided that it complies with the "individual prayer procedure". One of the criteria or conditions of the "individual prayer procedure" states that "personal prayer can be recited silently, while seated, so co-workers will not become distracted. While at the work-site, prostration, kneeling on the floor, standing, or the lifting of arms, will not be permitted". Through this memorandum Mr. Atkinson manages to completely prevent Muslim inmates from performing their obligatory prayers at work-sites (by restricting the movements that must be performed by Muslims) while allowing

all other religious groups to pray as their religion deems.

67.)  On or about June 11, 2013, Mr. Ramadan received the response to his BP-10 signed by Regional Director,SERO. In their response, SERO states that there is only one mandated congregational prayer for Muslims; that being Jumuah. With this response they to are attempting to redefine and relegislate the 1400+ year old religion of Islam.

68.)  On or about July 1, 2013 Mr. Ramadan proceeded to the next step in the F.B.O.P.'s Administrative Remedy Procedure or BP-11 by filing a Central Office Administrative Remedy Appeal. In this BP-11 Mr. Ramadan reiterates verbatim his request in the previous BP-10; requesting written confirmation that the change in Edgefield policy initiated from the Central Office of the F.B.O.P. due to the John Walker Lindh suit/case.

69.)  As of this brief Mr. Ramadan has not received a receipt nor response to this BP-11.

WHILE ACTING UNDER COLOR OF LAW DEFENDANTS TREAT MR. RAMADAN

DIFFERENTLY FROM SIMILARLY SITUATED RELIGIOUS GROUPS


70.)  The majority of the F.B.O.P. inmates are Christian, Jew or Native American. Like Mr. Ramadan, prayer and the ability to bring there religious books into the Chapel are some of the ways that these inmates practice their respective religion.


71.)  At F.C.I. McDowell, F.C.I. Edgefield and throughout the F.B.O.P. groups of inmates of different religious beliefs read from religious texts, hold hands, bow there heads and recite prayers together wherever they may be at that time, whether at work-sites, recreation, school, dining hall or the general are as of the of the housing units. Their prayers are conducted in open, conspicuous locations and have been witnessed by all prison staff and all Defendants named in this brief.


72.)  When these other religious adherents pray at work-sites, they do so in the presence of their supervisors. When these other religious adherents pray in the dining hall, they do so within sight of all prison staff including all the named Defendants.


73.)  Defendants Hogsten, Baxter, Ratelidge, Stiller, Nash and Connors tour F.C.I. McDowell almost daily and manage the operations of the prison. They witness the daily activities of the inmates, including other religious adherents engaging in

group prayer.

74.)  Defendants Samuels and Eichenlaub are aware of the
activities of the staff under there supervision because they
manage the day to day operations of the F.B.O.P. including
visiting prisons under their respective supervision.

75.)  While Defendants are aware that other religious
adherents routinely engage in prayer at work, school and
recreation they have denied Mr. Ramadan the same opportunities
to pray.

76.)  Defendants policies towards Mr. Ramadan and a Muslims
obligation to pray five times a day further exacerbates the
unequal treatment between similarly situated religious groups
and Muslims because it singles out Muslims and subjects them
to restrictions not applicable to other religions. For
example, the F.B.O.P. has designated an area on the recreation
yard at every prison within it's jurisdiction for the Native
Americans to perform their religious obligations such as
burning wood for a sweat lodge and prayer but refuse Mr.
Ramadan and Muslims in general an opportunity to pray at those
same recreation yards. The F.B.O.P.'s policy forces Muslims
whom must pray to leave their work-sites and return to their
cells for an hour, thereby losing pay, a requirement not
placed on any other religious group. The F.B.O.P.'s policy is
silent with regards to other religious adherents need to pray.
Thus, those adherents who wish to pray are not subject to the

same burdens as Muslims who wish to pray. Instead, other
religious participants continue to pray at work-sites,
schools, general areas of the housing units, recreation yard
and in the dining hall without any fear or risk of being
subject to discipline.

77.)   Despite knowing that other religious groups regularly
engage in prayers that violate prison policy, Defendants have
deliberately chosen not to enforce their policy against those
groups, even as they enforce it against Mr. Ramadan and all
other Muslims. While these other religious groups already
receive preferential treatment through such unequal and uneven
enforcement, the F.B.O.P.'s policy places additional burdens
on Muslims' free exercise of religion and makes explicit the
unequal treatment of Muslim inmates at F.C.I. McDowell, F.C.I.
Edgefield and through out the F.B.O.P.'s prisons.

LEGAL VIOLATIONS

COUNT ONE

VIOLATIONS OF THE RELIGIOUS FREEDOM RESTORATION ACT
"SUBSTANTIAL BURDEN ON RELIGIOUS EXERCISE"
( 42 U.S.C. §§ 2000bb et seq. )

78,)  Paragraphs 1-69 are incorporated by reference as if set forth fully herein.

79.)  Defendants have deprived and continue to deprive Mr. Ramadan of his right to free exercise of religion as secured by the Religious Freedom Restoration Act (RFRA), by unlawfully imposing a substantial burden on his religious exercise.

80.)  Defendants policies regarding religious activities and controlled movement require Mr. Ramadan and other Muslims to abandon their religious obligations because the policies force Mr. Ramadan and other Muslim inmates to choose between working, utilizing the recreation department, utilizing the education department and receiving the significant and valuable rehabilitation benefits associated therewith, and adhering to his sincere religious beliefs.

81.) The Defendants policies impose a substantial burden on Mr. Ramadan's religious exercise and the policies due not further a compelling governmental interest. Furthermore, even if the policies did further a compelling governmental interest, they do not represent the least restrictive means to further such interests.


COUNT TWO


VIOLATIONS OF THE EQUAL PROTECTION GUARANTEE OF THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION


82.) Paragraphs 1-69 are incorporated by reference as if set forth fully herein.


83.) Defendants have deprived and continue to deprive Mr. Ramadan of his right to equal protection of the laws, as guaranteed by the Fifth Amendment of the United States Constitution, by treating Mr. Ramadan and other Muslims differently from similarly situated religious groups.


84.) Under color of federal law, Defendants F.B.O.P., Samuels, Eichenlaub, Hogsten, Baxter, Ratelidge, Stiller, Nash and Connors have discriminated against Mr. Ramadan on the

basis of his religion by precluding him from praying at work detail sites, school, recreation and the general areas of the housing units and requiring him to return to his cell to pray, while allowing other religious adherents to pray when and wherever they choose.

85.) Under color of federal law, Defendants Samuels, Eichenlaub, Hogsten, Baxter, Ratelidge, Stiller, Nash and Connors have discriminated against Mr. Ramadan on the basis of his religion by flagrantly fabricating a ban on Qurans. This ban was also instituted and implemented as a form of retaliatory discrimination against Mr. Ramadan on the basis of his religion due to his utilizing the F.B.O.P.'s Administrative Remedy Procedure which is a right protected under the Prisoners Litigation Reform Act (PLRA).

86.) Under color of federal law, Defendants F.B.O.P. and Samuels have discriminated against Mr. Ramadan on the basis of his religion by retaliating against him and all Muslim inmates in light of the 7th Circuit's ruling in the Walker case/suit.

87.) Defendants purposeful discrimination against Mr. Ramadan as a Muslim, while treating other religious groups differently, is not rationally related to a legitimate governmental interest.

REQUEST FOR RELIEF


WHEREFORE, Plaintiff Saied Mousa Ramadan respectfully requests
that this Court grant the following relief:


a.)  A Declaration that Defendants' failure to accommodate
Mr. Ramadan's need to offer his five daily prayers at their
stated fixed times, in congregation, as required by his
sincere religious beliefs, violates his First Amendment Right
to freely exercise his religion and violates the RFRA.


b.)  A declaration that Defendants Samuels, Eichenlaub,
Hogsten, Baxter, Ratelidge, Stiller, Nash and Connors actions
of falsely engineering and implementing a retaliatory and
discriminatory ban on Qurans have invaded Mr. Ramadan's right
to freely exercise his religion and his right to equal
protection of the laws in violation of the First and Fifth
Amendments of the United States Constitution.


c.)  A declaration that Defendants' Samuels, Eichenlaub,
Hogsten, Baxter, Ratelidge, Stiller, Nash and Connors have
denied Mr. Ramadan his right to equal protection of laws, in
violation of the Fifth Amendment of the United States
Constitution.


d.)  A preliminary and permanent injunction requiring
Defendants to accommodate Mr. Ramadan and a Muslim inmates
need to pray five times each day in congregation at the proper

specified times.

e.)  A preliminary and permanent injunction enjoining Defendants from treating Mr. Ramadan and Muslims differently than similarly situated religious groups.

f.) An award to Mr. Ramadan of nominal damages and full costs of attorney's fees arising out of this litigation; and,

g.)  Such other relief as this Court may deem just and appropriate

DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Saied Mousa Ramadan hereby demands a trial by jury in this action of any issues so triable.

Respectfully submitted,

Dated September 19, 2013

9/26/13

Saied Mousa Ramadan

In Pro Se

F.C.I. Edgefield

P.O. Box 725

Edgefield, S.C. 29824